

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-22-2007

# USA v. Yamba

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2581

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Yamba" (2007). *2007 Decisions.* Paper 306.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/306

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-2581
_____

UNITED STATES OF AMERICA

v.

VIKRAM YAMBA,

Appellant

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal Action No. 04-cr-00329-1)
District Judge: Honorable Thomas M. Hardiman

_____

Submitted Under Third Circuit LAR 34.1(a)
April 24, 2007

Before: McKEE and AMBRO, <u>Circuit Judges</u>,
ACKERMAN,[*] <u>District Judge</u>.

_____

[*]Honorable Harold A. Ackerman, Senior United States
District Judge for the District of New Jersey, sitting by

(Opinion filed : October 22, 2007)

Adam B. Cogan, Esquire
One Northgate Square
Greensburg, PA   15601

      Counsel for Appellant

Mary Beth Buchanan
  United States Attorney
Rebecca R. Haywood
  Assistant U.S. Attorney
Robert L. Eberhardt, Esquire
Office of United States Attorney
700 Grant Street, Suite 400
Pittsburgh, PA   15219

      Counsel for Appellee

―――――――

OPINION OF THE COURT

―――――――

AMBRO, Circuit Judge

In this appeal we explore the contours of a corollary to

designation.

the "plain view" doctrine, known as "plain feel," in the context of a *Terry* search. After doing so, we conclude that the search at issue here – during which an officer discovered marijuana in Vikram Yamba's pocket, and this in turn led to the discovery of slips of paper resulting in his conviction for wire fraud – was legal. We therefore affirm the judgment of the District Court.

## I. Factual and Procedural Background

Yamba was indicted by a grand jury on seven counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.[1] The evidence against Yamba included several pieces of paper with what appeared to be credit card numbers written on them. These papers were discovered on Yamba's person during a routine

---

[1]The indictment lists seven wire communications forming the basis of the seven separate counts against Yamba, "all in violation of Title 18, United States Code, Sections 1343 and 2." The District Court interpreted this to mean that Yamba was indicted under 18 U.S.C. §§ 1342 and 1343. Though we recognize that the District Court's reading is plausible, we believe instead that the reference to "and 2" seeks to incorporate accomplice liability into the indictment under 18 U.S.C. § 2. Given these differing, but reasonable, readings—and the fact that the first requirement of a valid indictment is that it "fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 408 U.S. 87, 117 (1974)—the Government may wish to consider a manner of citation to the U.S. Code that causes less confusion.

inventory search that took place when he was booked at the police station after having been arrested for possession of marijuana. After unsuccessfully moving to suppress the papers as the fruits of an illegal search, Yamba was found guilty on all seven counts after a bench trial. He was sentenced to 18 months in prison and three years of supervised release. On this appeal he challenges only his conviction, arguing that the search that turned up the marijuana was illegal and, thus, that the papers discovered at his booking on marijuana-possession charges should have been suppressed at his trial on the wire fraud charges.[2]

The facts as found by the District Court regarding the initial search (which revealed the marijuana) are set out in detail in the District Court's thorough opinion. *See United States v. Yamba*, 407 F. Supp. 2d 703, 705–06 (W.D. Pa. 2006). The Court's findings are not clearly erroneous, *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002), and we summarize them here.

While on duty, Officer Matthew Livingstone saw a U-Haul truck parked at a gas station in a manner that blocked one of the entrances from the street, as well as some parking spaces. Livingstone approached the truck. As he got closer, he saw that the driver, Charles Coleman, was holding an open pocket knife.

---

[2]The District Court had jurisdiction under 18 U.S.C. § 3231; we have jurisdiction under 28 U.S.C. § 1291.

Livingstone also saw two passengers in the truck, Yamba and Jimaah Kpakpo, making "quick and furtive movements" below the dashboard.

When Officer Livingstone asked Coleman what he was doing at the gas station, Coleman responded that he, Yamba, and Kpakpo were delivering furniture to friends. Coleman, however, could not provide the names of these friends or the address to which he was delivering the furniture. Livingstone then asked to see Coleman's driver's license and the rental truck agreement. He also asked if there was anything in the truck besides furniture. Coleman responded that there was not and told Livingstone that he could search the truck if he wanted. Before Livingstone did so, though, he radioed his dispatcher to check on Coleman's credentials, and the dispatcher reported that there was an outstanding warrant for his arrest. Livingstone then handcuffed Coleman and sat him in the police car.

After that, Livingstone asked Yamba and Kpakpo to step out of the truck in order to conduct a patdown search of both of them. When he was frisking Yamba, Livingstone felt a plastic bag in Yamba's right jacket pocket. Livingstone testified, credibly according to the District Court, as follows:

> As I was conducting the pat-down, along the right side, right coat pocket, I could feel a plastic bag. I noted through training and experience [that] narcotics are stored and transported in plastic

5

baggies. After a brief second of just feeling it, I could tell that there was a soft spongy-like substance that is consistent with marijuana inside. I then recovered the bag from his pocket and found it contained suspected marijuana.

Livingstone then handcuffed Yamba and put him in the police car with Coleman. The patdown search of Kpakpo was uneventful.

At that point Officer Livingstone searched the rear of the U-Haul and found that it contained new furniture, wrapped in plastic. Upon questioning, Kpakpo said that he owned the furniture, that he had purchased it with a credit card, and that he was selling it. Soon after this, the dispatcher informed Livingstone that she had mistakenly reported that there was an outstanding warrant for Coleman's arrest, but that his license was suspended. Livingstone wrote Coleman a ticket for driving with a suspended license and then released him and Kpakpo. Because there was now no driver for the U-Haul, Livingstone had it impounded. He arrested Yamba for possession of marijuana.

At the police station during Yamba's booking, an inventory search of his person revealed "several slips of paper with the words 'credit card' and lines of numbers alternating down the page." When Livingstone asked Yamba about it, he reported that he had received the papers from a friend.

6

Livingstone then read Yamba his *Miranda* warnings and questioned him. Based on that questioning, Livingstone obtained a search warrant for the U-Haul. It was later determined that the furniture in the U-Haul was purchased from a Kaufmann's department store with one of the credit card numbers found on the papers discovered during the inventory search. This led to Yamba's conviction, which forms the basis of this appeal.

We review *de novo* the District Court's ruling that the initial pat-down search revealing the marijuana was legal and, thus, that the papers discovered at booking were admissible at the trial on the wire fraud counts. *Perez*, 280 F.3d at 336.

## II. Discussion

Yamba's argument proceeds in two parts. First, he contends that though Officer Livingstone ostensibly seized him pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), the seizure in fact was illegal, as that case does not permit an officer to do so under these circumstances. Second, he argues that, even if he was properly seized, the subsequent search of his person was outside the scope allowed under *Terry*. We address each contention in turn.

### A. The *Terry* Stop

In *Terry*, the Supreme Court held that a warrantless

7

seizure based on less than probable cause could be constitutionally permissible. Specifically, the Court said that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30. In outlining the contours of a permissible "*Terry* stop," the Court noted that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27. "The police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* at 21. Consistent with these statements, we have ruled that when "determining whether a stop is justified, the court must

8

view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers." *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984).

In this case, the entirety of the circumstances, as described by Officer Livingstone's testimony (found by the District Court to be credible), justified the *Terry* stop of Yamba. First, the U-Haul in which Yamba sat was parked in an odd and obstructive manner. Second, as Livingstone approached the U-Haul he observed the driver, Coleman, holding an open pocket knife. Third, he also noticed "quick and furtive movements" by the passengers, Yamba and Kpakpo. And fourth, upon having his dispatcher run a check on Coleman's license, Livingstone was informed that Coleman had an outstanding arrest warrant. This report later proved to be in error, but Livingstone was not unreasonable in relying on it. *See United States v. Mosely*, 454 F.3d 259, 260 n.16 (3d Cir. 2006).

Given these facts, Livingstone was "justified in believing that the individual whose suspicious behavior he [wa]s investigating at close range [Yamba] [wa]s armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24. As Livingstone testified,

> The pat-down was for officer safety. I already had one knife. I knew there was a weapon in the car, and a lot of times we as police officers like to add plus one. Where there's one

9

weapon, there's likely another weapon.

> There were three of them at one point [Coleman, Yamba, and Kpakpo], and there was myself and my partner[, who arrived at the scene shortly before Yamba's pat-down].  So we're outnumbered.  It was for officer safety.

> . . . .

> . . . . We already had one wanted person.

> . . . .

> . . . . The fast movements of the hands going from the dash and then being concealed underneath them and what appeared to be in the pockets was also an issue.

> . . .

> The fact that Mr. Coleman could not provide any answers to simple questions that I had asked him also raised my suspicion of some possible criminal activity.

This testimony—again, found by the District Court to be credible—reveals the "specific and articulable facts which,

10

taken together, with rational inferences from those facts, reasonably warrant[ed]" subjecting Yamba to a pat-down search. *Id.* at 21. The stop, therefore, was justified under *Terry*.

**B. Seizing the Contraband under the "Plain Feel" Doctrine**

That Officer Livingstone was entitled to stop Yamba under *Terry* still leaves the question of whether the pat-down search was properly conducted. For if it was not, there would be a ripple effect on the criminal case against him, ending in the exclusion of the papers with allegedly stolen credit card numbers as "fruit[s] of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963); *see Sibron v. New York*, 392 U.S. 40, 65–66 (1968); *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006). Those papers, of course, were found in a routine (and legal) inventory search upon Yamba's booking at the police station, *Illinois v. Lafayette*, 462 U.S. 640 (1983), which took place after his arrest—an arrest made possible only by the discovery of marijuana during the *Terry* search.[3]

In *Terry*, the Supreme Court said that "[t]he scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." 392 U.S. at 18. It later expounded on that statement when speaking about *Terry*

_____

[3]Yamba does not contest the inventory search, only the *Terry* search.

11

searches specifically:

> The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . . So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search *limited in scope to this protective purpose*.

*Adams v. Williams*, 407 U.S. 143, 146 (1972) (footnote omitted) (emphasis added). The proper scope of a search becomes critical when police discover something suspicious they were not expecting or intending to find. And in such a case the "plain view" doctrine often governs whether their discovery can be admitted against a defendant. *See, e.g.*, *Arizona v. Hicks*, 480 U.S. 321 (1987).

As the Supreme Court has said, precedent has "come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Texas v. Brown*, 460 U.S. 730, 739 (1983) (plurality opinion) (citing *Frazier v. Cupp*, 394 U.S. 731 (1969); *Harris v. United States*, 390 U.S. 234 (1968); *United States v. Lefkowitz*, 285 U.S. 452 (1932); *Marron v. United States*, 275 U.S. 192 (1927)). The "plain view" doctrine, therefore, is best understood "not as an independent exception

to the warrant clause, but simply as an extension of whatever the prior justification for an officer's access to an object may be." *Brown*, 460 U.S. at 738–39 (internal quotation marks omitted). So understood, courts have logically extended this concept to permit the admission of evidence discovered with other sensory faculties. *See, e.g.*, *United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) ("plain smell") (citing *United States v. Haley*, 669 F.2d 201, 203 (4th Cir. 1982); *United States v. Clayton*, 210 F.3d 841, 845 (8th Cir. 2000); *United States v. Rhiger*, 315 F.3d 1283, 1290 (10th Cir. 2003)); *United States v. Baranek*, 903 F.2d 1068, 1070–72 (6th Cir. 1990) ("plain hearing"). In this case, we deal with another application of the "plain view" doctrine: "plain feel."

Unlike "plain hearing" and "plain smell," which the Supreme Court has not decided, it has put its imprimatur on "plain feel."[4] In *Minnesota v. Dickerson*, the Court took up the issue of "whether police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry*," and decided that "the answer clearly is that they may, so long as the officers' search stays within the bounds marked by *Terry*." 508 U.S. 366, 373 (1993). Since *Dickerson*, our Court has not had the opportunity to examine

---

[4]This is not to express our disapproval of the "plain hearing" and "plain smell" applications of the "plain view" doctrine, neither of which our Court has examined in a precedential opinion.

13

and apply its teachings in a precedential opinion.

In *Dickerson*, police officers were patrolling a neighborhood and saw the defendant leaving what was known to them as a "crack house." When he saw the officers in their patrol car, the defendant "abruptly halted and began walking in the opposite direction." *Id.* at 368–69. He then walked into an alley. This activity aroused the suspicion of the officers, and they decided to investigate further. After ordering the defendant to stop, one of the officers conducted a *Terry* search of the defendant. According to the Court, "[t]he search revealed no weapons, but the officer did take an interest in a small lump in [the defendant's] nylon jacket." *Id.* at 369. The officer testified later at an evidentiary hearing that, "[a]s I pat-searched the front of his body, I felt a lump, a small lump, in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane." *Id.* At that point the officer "reached into [the defendant's] pocket and retrieved a small plastic bag containing one fifth of one gram of crack cocaine." *Id.* The trial court admitted the contraband by "analogizing to the 'plain-view' doctrine." *Id.* The Minnesota Court of Appeals, though finding a valid *Terry* stop, reversed the evidentiary ruling, concluding that "the officers had overstepped the bounds allowed by *Terry* in seizing the cocaine." *Id.* at 370. Both the Minnesota Supreme Court and the U.S. Supreme Court affirmed.

Before addressing the "plain feel" concept, the Supreme

Court first described the "plain view" doctrine from which it derived:

> [I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if its incriminating character is not immediately apparent—the plain-view doctrine cannot justify its seizure.

*Id.* at 375 (citations, brackets, and internal quotation marks omitted). Applying this rule, the Court focused on the trial court's findings regarding what the officer believed about the lump in the defendant's pocket. Specifically, it noted that the officer "made no claim that he suspected this object to be a weapon." *Id.* at 378 (internal quotation marks omitted). "[T]he officer's own testimony," the Court went on to say, "belies any notion that he 'immediately' recognized the lump as crack cocaine. Rather, . . . the officer determined that the lump was contraband only after squeezing, sliding, and otherwise manipulating the contents of the defendant's pocket—a pocket which the officer already knew contained no weapon." *Id.*

15

Since *Dickerson*, many courts have focused on exactly how "immediately" an officer must know that something felt during a *Terry* search is contraband or precisely how much a clothed object can be manipulated before a search becomes illegal. *See, e.g.*, *United States v. Williams*, No. CRIM. RDB-05-0240, 2005 WL 1902490, at *6 (D. Md. Aug. 9, 2005); *United Stated v. Ramirez*, No. 02 CR 1228(GEL), 2003 WL 260572, at *7 (S.D.N.Y. Feb. 5, 2003) ("No doubt a metaphysician could draw distinctions between 'immediately' knowing something, knowing it after a 'second or two,' being 90% certain of something after running one's fingers across it, and knowing for certain after squeezing it."). And in the course of admitting in evidence certain contraband that was discovered in a *Terry* search, courts have credited testimony by some police officers that suggests remarkable sensory powers. *See, e.g.*, *United States v. Ashley*, 37 F.3d 678, 681 (D.C. Cir. 1994) (admitting in evidence contraband known "immediately" to be crack, despite the fact that it was found "inside two pair of pants, a pair of briefs, a paper bag, a paper napkin, and a plastic bag"). Even the officer in this case testified—credibly, according to the District Court—that after feeling through a "middle medium weight jacket" for what "[p]robably wasn't even a half second," he nevertheless "could tell right away" that the lump in Yamba's pocket was marijuana.

We reject a narrow focus on how quickly and certainly the nature of an object felt during a *Terry* search is known and on how much manipulation of a person's clothing is acceptable.

16

In *Terry*, the Supreme Court authorized police officers to perform a routine pat-down search for weapons. Such searches necessarily involve a certain amount of "squeezing, sliding and otherwise manipulating" of a suspect's outer clothing, 508 U.S. at 378, in an attempt to discern whether weapons are hidden underneath. Thus, the problem with the officer's actions in *Dickerson* must be more than simply their occurrence. And a close reading of the case reveals what that "more" entails.

The Court in *Dickerson* clearly identified the object of a proper *Terry* search: weapons. *Id.* at 373 (stating that a *Terry* search "must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." (internal quotation marks omitted)). The same sentence in *Dickerson* that identified "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket" as a problem also noted that the officer committed the offending conduct when he "already knew [the pocket] contained no weapon." *Id.* at 378. The Court repeated the refrain in the next paragraph:

> Here, the officer's continued exploration of [the defendant's] pocket *after having concluded that it contained no weapon* was unrelated to the sole justification of the search under *Terry*: the protection of the police officer and others nearby. It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize

17

and that we have condemned in subsequent cases.

*Id.* (emphasis added; brackets, ellipsis, internal quotation marks, and citations omitted).

The proper question under *Dickerson*, therefore, is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concludes that it is not a weapon. That is, a *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be confiscated if spontaneously discovered during a properly executed *Terry* search. Moreover, when determining whether the scope of a particular *Terry* search was proper, the areas of focus should be whether the officer had probable cause to believe an object was contraband *before* he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk. *United States v. Jones*, 303 F. Supp. 2d 702, 706 (D. Md. 2004) (citing *Dickerson*, 508 U.S. at 376; *Hicks*, 480 U.S. at 327).

Assuming that an officer is authorized to conduct a *Terry* search at all, he is authorized to assure himself that a suspect has no weapons. He is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon. If, before that point, the officer develops

18

probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search.  If, indeed, he discovers contraband, the officer may seize it, and it will be admissible against the suspect.  If, however, the officer "goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 508 U.S. at 373.

In making this ruling, we join at least two of our sister courts of appeals that have framed the issue in this way.  *See United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000) ("Had the officer continued to manipulate the object beyond what was necessary to ascertain that it posed no threat, he would have run afoul of the Supreme Court's holding in *Minnesota v. Dickerson*."); *United States v. Rogers*, 129 F.3d 76, 79 (2d Cir. 1997) ("Sergeant Mason was conducting a lawful protective patdown search (a point that Rogers concedes) when he felt the heavy object in Rogers' coat pocket.  He manipulated the object for 'a few seconds' to determine what it was, and felt 'a hard object and then a softer object.'  At that point, Mason was not yet able to exclude the possibility that there was a weapon in the pocket, so that the search was still within the bounds of *Terry*, and Mason had become 'fairly certain' the pocket contained drugs.  That belief, combined with Rogers' evasive and suspicious conduct, gave the officers probable cause to search Rogers' pocket for contraband.  The police were therefore permitted to remove and open the rolled-up paper bag.").

19

In our case, Officer Livingstone "felt around" or otherwise "manipulated" the contents of Yamba's pocket in the process of checking for weapons when he came across what in his experience could be contraband. It is not key whether Livingstone was certain that the object in Yamba's pocket was contraband by the time he knew it not to be a weapon; what is key is whether Livingstone had probable cause to believe that it was and this occurred at the same moment or before he determined that Yamba had no gun on his person.

The record demonstrates that probable cause indeed existed before Livingstone's search went beyond the bounds of *Terry*. Livingstone testified that, when he felt Yamba's pocket, he could feel a plastic bag containing a "soft[,] spongy-like substance." Though it is true, as Yamba's counsel noted in cross-examination, "grass[5] or oregano" might feel similarly soft or spongy, people do not normally go around with those substances in their pockets. Moreover, Officer Livingstone also felt "small buds and seeds" along with the contents of the plastic bag. This detail is more consistent with marijuana than lawn grass or oregano. Based on Livingstone's experience, he reasonably suspected that Yamba had marijuana in his pocket. His belief was reached quickly and upon minimal manipulation of Yamba's pocket from the outside, consistent with a routine frisk allowed by *Terry*. And though Livingstone admitted to

---

[5]The context indicates that this refers to the lawn-type variety.

manipulating the object even after forming the belief that it was not a weapon, he only did so to "mak[e] sure it was what [he] knew it to be." In other words, by that point Officer Livingstone *already* had probable cause to conduct a more intrusive search than that authorized by *Terry* alone.

While one may reasonably question the veracity of Officer Livingstone's testimony, it was credited by the District Court. Were we the fact-finder, we may not have done the same; but we cannot say that the Court's finding was clearly erroneous. Nevertheless, consistent with the legal standard set out above, we purposely do not rely on the precision of Officer Livingstone's testimony that he reached his conclusion within "a half second." However long it took Livingstone to form that belief, the record indicates that he did so within the bounds of *Terry*, as there is nothing to suggest that he conducted anything beyond a routine frisk until after there was probable cause to search more intrusively.

\* \* \* \* \*

For these reasons, the *Terry* search that revealed marijuana in Yamba's coat pocket was conducted within the bounds set by the Supreme Court. We therefore affirm the District Court's denial of Yamba's motion to suppress the later-discovered slips of paper and, consequently, his convictions for wire fraud.

21