

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-6-2008

# USA v. Henry

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3961

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Henry" (2008). *2008 Decisions.* Paper 1267.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1267

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-3961
_____

UNITED STATES OF AMERICA

v.

JEREMY A. HENRY

Jeremy Henry,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 05-cr-00215)
District Judge:  Honorable Anita B. Brody
_____

Submitted Under Third Circuit LAR 34.1(a)
April 18, 2008

Before:  SCIRICA, *Chief Judge*, AMBRO and FISHER, *Circuit Judges*.

(Filed:  May 6, 2008)
_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Defendant Jeremy Henry appeals the District Court's denial of his motion to suppress a loaded handgun as evidence against him, resulting in a judgment of his guilt on two violations of federal criminal law. For the reasons that follow, we will affirm.

I.

We write exclusively for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

On January 13, 2005, the Cheltenham Township Police Department established surveillance of a Wendy's Restaurant parking lot, after receiving a tip from a previously relied-upon confidential informant about possible criminal activity at that location, which was also in a high-crime area. The tip was that, at around 4:00 p.m., the informant saw an individual drive into the parking lot in a silver Nissan Altima, get out of the car with a large duffel bag, and drive off in another car, a silver Nissan Xterra, leaving the Altima in the parking lot.

Shortly after the surveillance began at around 4:45 p.m., the officers saw a man – later identified as Henry – drive into the parking lot at around 5:30 p.m. in a silver Nissan Xterra but park at a corner away from the restaurant, where cars typically do not park unless the lot was full. Henry remained in his vehicle but repositioned it in the parking lot multiple times.

2

At about 6:30 p.m., several unrelated incidents in the neighborhood resulted in heavy police activity in the vicinity of Wendy's. At that point, Henry left the parking lot in the Xterra. Approximately half an hour later, he returned and resumed moving the Xterra around the parking lot every several minutes.

At around 7:30 p.m., Henry parked the Xterra next to the Altima. He placed a bag and coat in the Altima and then began to walk back to the Xterra. At this time, Officer Joseph O'Neill, in plainclothes, approached him and asked to talk to him. According to O'Neill, Henry immediately tensed up and became visibly nervous. Henry also tried to sidestep O'Neill so that the Xterra was in between them. A second officer, Dave Chiofolo, approached Henry from behind. According to the officers, before either of them touched him, Henry started reaching toward his waist.

Chiofolo then grabbed Henry's arm, identified himself as an officer, and informed him that he would conduct a pat-down search. He did so and felt a firearm beneath Henry's pants, in his pelvic area. When Henry began to resist, Chiofolo took Henry to the ground and maintained his hold on the firearm while trying to restrain him. Henry did eventually comply and was taken into custody. The officers recovered a .40 caliber handgun from Henry's person. The gun was loaded with eleven rounds of live ammunition.

On April 14, 2005, Henry was indicted for illegal reentry after deportation in violation of 8 U.S.C. § 1326(a) and (b)(2) and for possession of a firearm by an illegal

alien in violation of 18 U.S.C. § 922(g)(5)(A). An evidentiary hearing on Henry's motion to suppress the gun seized from him was conducted on November 8 and 9, 2005. The District Court denied the motion.

On November 28, 2005, Henry pleaded guilty to both counts of the indictment, while reserving the right to appeal the District Court's ruling on the motion to suppress. On August 23, 2006, the District Court sentenced Henry to 57 months' imprisonment. Henry then filed a timely notice of appeal.

II.

We have jurisdiction under 28 U.S.C. § 1291. *United States v. Yamba*, 506 F.3d 251, 253 n.2 (3d Cir. 2007). We review "the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

Here, Henry does not dispute the District Court's factual findings. The arguments Henry does make are that the officers had no reasonable suspicion either (1) to seize his person or (2) to conduct a pat-down search of his person, as required under *Terry v. Ohio*, 392 U.S. 1 (1968).[1] *Terry* and its progeny establish that investigatory stops short of

---

[1]Our resolution of these arguments obviates the need to address Henry's additional argument that the District Court erred in finding that the officers' initial approach of Henry was a citizen encounter rather than a Fourth Amendment seizure. As we will explain, we believe that the officers already had reasonable suspicion to seize Henry when they first approached him.

traditional arrest are valid when supported by an officer's reasonable suspicion that criminal activity "may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citations omitted). The scope of a valid *Terry* stop includes a brief detention of the person and a pat-down search for weapons. *See* 392 U.S. at 22-24, 27; *Yamba*, 506 F.3d at 256.

Here, the District Court gave ample reasons why the officers had reasonable suspicion to believe that criminal activity may be afoot. Initially, the tip came from an informant on which Officer O'Neill had relied in the past, so the informant was not anonymous. *See United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005) (explaining the difference between anonymous and known confidential informants, the latter requiring less stringent scrutiny of their veracity, reliability, and basis of knowledge). Then, hours of surveillance by the two officers corroborated the tip and provided the additional information to create reasonable suspicion. *See United States v. Brown*, 448 F.3d 239, 251 (3d Cir. 2006) (explaining that reasonable suspicion can be established by a tip plus one or more factors such as presence of suspect in a high-crime area and suspect's behavior that conforms to officers' specialized knowledge of criminal activity).

For example, Henry's use of two cars to, from, and within the Wendy's parking lot over a period of several hours suggested that he was not a patron of the restaurant. Second, the officers testified that they had personal knowledge that the parking lot was located in a high-crime area. Third, the fact that Henry parked the Nissan Xterra on the

far side of the lot when it was not full, then repositioned it numerous times, then did not meet anyone else there, suggested that he might be scoping out the location for criminal activity, such as a drug transaction, robbery, or burglary. Fourth, the officers' suspicion was heightened by Henry's driving away when marked police cruisers entered the area to respond to unrelated incidents, only to return when the coast appeared clear. Under the totality of the circumstances, *see Arvizu*, 534 U.S. at 273, we conclude that the officers' own training and experience, combined with their observations of and inferences from Henry's behavior, gave them reasonable suspicion to effect a *Terry* stop.

With respect to Henry's second argument, he does not argue that the scope of the officers' pat-down search extended beyond a search for weapons, but instead argues that the officers had no reasonable suspicion to believe that he was armed and dangerous. The facts defeat his argument. Officer Chiofolo did not conduct a pat-down search as part of the *Terry* stop until Henry tried to separate himself from O'Neill by the Xterra and reached his hand beneath his pants at the waist. These movements gave Chiofolo reasonable suspicion to believe that "the person[] with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30.

### III.

For the foregoing reasons, we will affirm the District Court's judgment.