**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-1708
_____

UNITED STATES OF AMERICA

v.

JONATHAN MAURICE SCOTT,

Appellant

_____

No. 19-3335
_____

UNITED STATES OF AMERICA

v.

JOEL LEE QUENTIN SCOTT,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-17-cr-00151)
District Judge: Honorable J. Curtis Joyner

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 2, 2020

_____

Before: GREENAWAY, JR., SHWARTZ, and RENDELL, <u>Circuit Judges</u>.

_____

OPINION[*]

_____

SHWARTZ, <u>Circuit Judge</u>.

Jonathan and Joel Scott appeal the District Court's order denying their motions to suppress: (1) evidence seized as a result of an investigative stop and frisk and (2) out-of-court identifications. For reasons that follow, we will affirm.

I

A

On a December afternoon in Feasterville, Pennsylvania, two men entered a BB&T Bank. The taller man wore a black hooded sweatshirt, a turquoise scarf over his face, black pants, and black shoes. The shorter man wore a brown hooded sweatshirt, black ski mask, black pants, and white shoes with red trim. The shorter man drew a gun, jumped over the teller's counter, and ordered the teller to give him money. The teller placed about $1,800 into a green money bag and handed it to him.

The branch manager saw the shorter man's movements from her office, which was twenty to twenty-five feet from the teller's counter, and activated the alarm. The taller man entered her office and stood about three feet from her. When the manager stood up, the man told her not to move and to shut up, pointing his left hand at her face. He stayed in the office until the robbery was complete.

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Two minutes later, the police received a radio dispatch about an armed bank robbery in progress by two Black men at BB&T. The first man was described as carrying a gun and wearing a brown hooded sweatshirt and a mask, and the second man was described as wearing a black hooded sweatshirt and a turquoise scarf over his face.

Minutes later, Officer Sean Dougherty, a corporal with seventeen years' experience, responded to the bank. Officer Remo DiLello also responded and, upon confirming the description with the manager, dispatched a second description of the suspects as two Black males with a handgun. Dougherty left DiLello at the bank and drove toward Penn Gate Circle, a dead-end street just behind the bank.

When Dougherty turned onto Penn Gate Circle, he saw two Black men walking. As the men approached the intersection, "they glanced over in [his] direction and . . . when they saw [him], they changed their direction to . . . go left onto Penn Gate." J.A. 180. Dougherty continued to follow the men "at an extremely close distance" and "put [his] bumper up only a couple feet off of the back of them," but the men "ignore[d]" him. J.A. 180-81.

Dougherty saw that the taller man was wearing a coat, while the shorter man was wearing a short-sleeved shirt, which Dougherty found unusual because the weather was cold and damp. Dougherty called for backup, stating that he had two subjects matching descriptions of the robbers. Dougherty then stopped his car, exited, drew his gun, and ordered the men to stop and put their hands up. The men complied. They were 100 to 125 yards from the bank.

3

The events at Penn Gate Circle were broadcast over Officer DiLello's and Detective Stephen Brookes's radios as they spoke with the bank manager, and she could hear that subjects had been detained.

About five minutes after the robbery, Sergeant Louis Montalbano and Officer Dave Engle arrived at Penn Gate Circle. Dougherty testified that he directed Engle and Montalbano to place the men in handcuffs for the officers' safety. Dougherty holstered his weapon. DiLello arrived thereafter.

After they were placed in handcuffs, the two men were identified as Joel and Jonathan Scott. Montalbano began to pat down Joel Scott. Dougherty testified that, during the pat-down, Montalbano pointed and said, "[h]e's got some money in his pocket." J.A. 188. Dougherty took over the pat down of Joel Scott and testified, "I could feel a considerable amount of cash in his pocket." J.A. 188. He testified that he squeezed the object in Joel Scott's pocket to rule out the possibility that a sharp weapon was behind it. He confirmed first, "that it was a wad of cash; and [second], there was nothing that could poke" him as he went to get the object. J.A. 248. Cash was removed from Joel Scott's front right pocket. As he continued the pat down, Dougherty felt "another significant lump in [Joel Scott's front left] pocket that was consistent with cash." J.A. 188-89. Cash was removed from Joel Scott's front left and rear pockets. The men then were placed in separate police vehicles. By then, several more officers had arrived on scene.

Officer DiLello returned to the bank and asked the manager if she would travel with him to the scene. He told her that the officers had stopped two subjects and said,

4

"[i]f you can definitely positively identify these guys as being involved, then that's what we're looking for. But if they're not, you can say, 'I don't know,' or you can say '[i]t's not them,' that's a fine answer." J.A. 313-14. She agreed and rode with DiLello to the location where the men were stopped. DiLello pulled his vehicle about ten to twelve feet from the subjects. The manager had a clear view through the passenger window. She viewed Jonathan Scott first, who stood handcuffed, flanked by an officer on each side. She positively identified Jonathan Scott as a robber, and Officer DiLello testified that "[s]he seemed pretty sure." J.A. 317. DiLello then backed up his vehicle so she could view Joel Scott, who also stood handcuffed with an officer at each side. She positively identified Joel Scott as a robber and gave DiLello "an indication that she was sure." J.A. 319. The identifications were made about nineteen minutes after the robbery. Defendants were arrested.

The manager was transported back to the bank. There, she told Detective Brookes that she identified Joel Scott by his black pants and that he was the shorter of the subjects. She identified Jonathan Scott by his pants, his dark shoes, and the size of his hands.

Near the bank, officers found a vehicle registered to Jonathan Scott, along with a pair of white Reebok sneakers with red trim, a brown hooded sweatshirt containing keys to the bank, and a black ski mask, consistent with what the shorter robber depicted in the surveillance video wore. Through the vehicle window, officers saw a black hooded sweatshirt and turquoise scarf, consistent with what the taller robber wore, as well as the green money bag taken from the bank. The officers also discovered a six-shot revolver in the glove box of the vehicle consistent with the gun in the surveillance video.

5

B

A federal grand jury returned a two-count indictment charging Defendants with armed bank robbery, 18 U.S.C. §§ 2113(d) and 2, and brandishing a firearm during and in relation to the commission of the bank robbery, 18 U.S.C. §§ 924(c)(1) and 2. Defendants moved to suppress evidence recovered from the investigatory stop and pat down and the manager's identification.

The District Court held a hearing and considered testimony from Dougherty, DiLello, and Brookes, which it found credible. The Court then entered orders denying the suppression motions and stating that it would "further supplement the record of this case with Findings of Fact and Conclusions of Law at a later date." J.A. 75 n.1, 76 n.2. The Court did not, however, do so.

Defendants entered into conditional guilty pleas that preserved their right to appeal the denial of their suppression motions. On appeal, we vacated the District Court's order and remanded for the Court "to explain its reasons for denying the suppression motions even though the testimony the government offered at the suppression hearing was inconsistent." United States v. Scott, 777 F. App'x 54, 55 (3d Cir. 2019).

On remand, the District Court made findings and again denied Defendants' motions to suppress. United States v. Scott, 420 F. Supp. 3d 295 (E.D. Pa. 2019). The Court held that (A) Dougherty had reasonable suspicion to stop and conduct a pat down search of Defendants, id. at 313; (B) Joel Scott's pat down fell within the "plain feel" doctrine and thus did not exceed the scope of Terry v. Ohio, 392 U.S. 1 (1968), id. at 317;

6

and (C) the manager's identification was reliable and was not the product of an impermissibly suggestive show up, id. at 319.  Defendants appeal.

## II[1]

Defendants raise three arguments.  First, they argue that Corporal Dougherty did not have reasonable suspicion to stop them and that the force used transformed the stop into a de facto arrest without probable cause, such that the evidence should have been suppressed.  Second, Joel Scott argues that even if the stop were proper, his pat down exceeded Terry's scope, and the money from his pockets should be suppressed.  Third, Defendants argue that the manager's identification of them was unduly suggestive and unreliable and should be suppressed.

## A

We first address whether the initial stop was supported by reasonable suspicion and whether the stop exceeded the permissible scope of Terry.  The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies."  United States v. Hester, 910 F.3d 78, 84 (3d Cir. 2018) (citation omitted).  In Terry, the Supreme Court set forth an exception that allows a police officer to conduct a "brief, investigatory stop when the

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291.

"In reviewing a motion to suppress, 'we review a district court's factual findings for clear error, and we exercise de novo review over its application of the law to those factual findings.'"  United States v. Goldstein, 914 F.3d 200, 203 n.15 (3d Cir. 2019) (quoting United States v. Katzin, 769 F.3d 163, 169 n.4 (3d Cir. 2014) (en banc)).

7

officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

Because "this reasonable suspicion requirement is only triggered by a seizure," Hester, 910 F.3d at 84, we first "pinpoint the moment of the seizure and then determine whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity," United States v. Lowe, 791 F.3d 424, 430 (3d Cir. 2015) (alterations in original) (internal quotation marks and citation omitted). Defendants were seized when Dougherty drew his service weapon and ordered them to stop and put their hands up, and they complied. See United States v. Brown, 448 F.3d 239, 246 (3d Cir. 2006) (holding that defendant was seized when he submitted to the officer's show of authority by turning to face the police and placing his hands on the vehicle). Thus, we must determine whether the stop was supported by "reasonable, articulable suspicion." Wardlow, 528 U.S. at 123.

To determine whether reasonable suspicion existed, we assess the "totality of the circumstances" to see whether the officer had a "particularized and objective basis" for suspecting wrongdoing, accounting for trained officers' commonsense judgments and inferences about human behavior. United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). We ask "whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the] detention," United States v. McCants, 952 F.3d 416, 422 (3d Cir. 2020) (alterations in original) (quoting Brown, 448 F.3d at 246-47), and "afford significant deference to a law enforcement officer's determination of reasonable

8

suspicion," United States v. Torres, No. 19-2940, -- F.3 – 2020 WL 3024560, at *3 (3d Cir. 2020) (citation omitted). Factors reflecting suspicious behavior include "unprovoked flight upon noticing the police," "nervous, evasive behavior," Wardlow, 528 U.S. at 124, "temporal and physical proximity to the" crime scene, and "the officer['s] familiarity with the neighborhood," United States v. Bey, 911 F.3d 139, 146 (3d Cir. 2018).

Defendants' stop was supported by reasonable suspicion. Corporal Dougherty, an experienced officer, heard a report of a robbery by two Black men at a nearby bank. He promptly drove to the residential area just behind the bank, an area with which he was "extremely familiar." J.A. 173. He then saw the two Defendants, both Black men, walking about 100 yards from the bank minutes after the robbery in a residential area that gets little car or foot traffic. When Defendants saw Dougherty, they changed directions to proceed down a dead-end street; and then when he rode his vehicle close to them, they did not react. In addition, Joel Scott's attire was unusual given the weather because he wore a short-sleeved shirt on a cold, damp December day.

With respect to the issue of reasonable suspicion, this is a close case. Defendants were not wearing all of the clothing described in the dispatch or depicted on the surveillance video, and their reaction to the police vehicle could be viewed as non-suspicious avoidance of a car tailing two pedestrians at close range. Joel Scott, however, was wearing short sleeves in thirty-degree weather, and the pair was stopped within 125 yards of a bank that minutes earlier had been robbed by two men. Cf. Brown, 448 F.3d at 252 (holding "excessively general description" and "unreliable location tip in the absence

9

of corroborating observations by police" did not support reasonable suspicion).  Thus, based on the totality of the circumstances, the initial stop was permissible under Terry.

Defendants contend that their seizure exceeded the permissible scope of Terry and became a de facto arrest requiring probable cause because Dougherty's weapon was drawn, Defendants were handcuffed and placed in separate police vehicles, and several police vehicles were at the scene.  We disagree.

In distinguishing a warrantless arrest from an investigatory stop, "the 'reasonableness of the intrusion is the touchstone' of our analysis."  Torres, 2020 WL 3024560, at *2 (quoting Baker v. Monroe Township, 50 F.3d 1186, 1192 (3d Cir. 1995)).  A Terry stop "must be 'minimally intrusive' and tailored by police to 'diligently pursue[ ] a means of investigation that [is] likely to confirm or dispel their suspicions quickly[.]'"  United States v. Foster, 891 F.3d 93, 106 (3d Cir. 2018) (alterations in original) (quoting United States v. Sharpe, 470 U.S. 675, 685-86 (1985)).  Nothing in the officers' conduct here exceeded the permissible scope of Terry.  When he first approached Defendants, Dougherty's decision to draw his service weapon for his safety was reasonable because he was alone and reasonably expected Defendants, suspects in an armed bank robbery that had just taken place, to still be armed.  See United States v. Johnson, 592 F.3d 442, 453 (3d Cir. 2010) ("An officer with reasonable suspicion that the occupants of a vehicle are armed and dangerous does not act unreasonably by drawing his weapon, ordering the occupants out of the vehicle, and handcuffing them until the scene is secured.").  The same safety concerns justified Dougherty's instruction to handcuff Defendants when the other officers arrived on scene, after which he properly holstered his weapon.  See id.

10

The officers performed a pat down of Defendants and placed them in police vehicles long enough to bring the manager to the scene to determine if they were the robbers. The entire process took nineteen minutes, and the record does not reflect any unnecessary delays. See Sharpe, 470 U.S. at 687 (holding that twenty-minute detention was not unreasonable where the officer pursued the investigation "in a diligent and reasonable manner" and did "not involve any delay unnecessary to the legitimate investigation"). Thus, the stop "was reasonably related in scope to the circumstances which justified the interference in the first place," Terry, 392 U.S. at 20, and did not amount to a de facto arrest.

B

Joel Scott's pat down was also conducted within the bounds of Terry.[2] When "an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous," a Terry stop may include "a patdown search to determine whether the person is in fact carrying a weapon," but "must be strictly limited to that which is necessary for the discovery of weapons." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (internal quotation marks and citations omitted). If during the frisk for weapons, the officer feels an object whose "contour or mass makes its identity [as contraband] immediately apparent," the officer may seize it. Id. at 375-76. In applying this "plain feel" doctrine, we focus on "whether the officer had probable cause to believe an object was contraband before he knew it not to be a weapon

___

[2] In the District Court, Jonathan Scott conceded that he "lacks standing to seek suppression of the" cash "Joel Scott seeks to suppress." ECF No. 45 at 1.

11

and whether he acquired that knowledge in a manner consistent with a routine frisk." United States v. Yamba, 506 F.3d 251, 259 (3d Cir. 2007) (emphasis omitted). Thus, the officer "is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon." Id. If the officer develops probable cause to believe the "object is contraband, he may lawfully perform a more intrusive search." Id.

Here, Corporal Dougherty, whom the District Court found credible, knew he was investigating a recent armed bank robbery and testified that he squeezed the object in Joel Scott's pocket to rule out the possibility that a sharp weapon was behind it. He confirmed first, "that it was a wad of cash," and second that "there was nothing that could poke" him as he went to get it. J.A. 248. Because Dougherty "had probable cause to believe [the] object was contraband [in the form of cash] before he knew it not to be a weapon," Yamba, 506 F.3d at 259 (emphasis omitted), the pat down and seizure were permitted under Terry.

<h2 style="text-align:center">C[3]</h2>

We finally address whether the show up identification procedure violated due process. An out-of-court identification procedure violates due process when it is (1) "suggestive and unnecessary," and (2) gives rise to a "substantial likelihood of misidentification." Perry v. New Hampshire, 565 U.S. 228, 239 (2012) (citation omitted). The first inquiry "contains two component parts: that concerning the

---

[3] We review a decision to admit identification testimony for abuse of discretion. United States v. Brownlee, 454 F.3d 131, 137 (3d Cir. 2006) (citation omitted).

suggestiveness of the identification and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." United States v. Brownlee, 454 F.3d 131, 137 (3d Cir. 2006) (quoting United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991)). A "show-up" identification "is inherently suggestive." Id. at 138.

"[U]nnecessary suggestiveness alone," however, "does not require the exclusion of evidence." Id. at 138-39 (citation omitted). Instead, "reliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977). To determine "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive," we consider (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation," and (5) "the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199-200 (1972). We "weigh[] the corrupting effect of the suggestive identification itself" against these factors. Manson, 432 U.S. at 114.

Here, even assuming either identification was unnecessarily suggestive, the totality of the circumstances establishes that each identification was reliable and that any weaknesses go to weight rather than admissibility. First, the manager saw Jonathan Scott from three feet away and had a well-lit, unobstructed view of Joel Scott from her office. Second, while each of their faces were covered, she saw their bodies and clothing. She explained that she recognized Jonathan Scott based upon the size of his hands, his shoes, and the pants he was wearing. As to Joel Scott, she told police she recognized his black

13

pants and shorter stature.  Thus, the clothing she observed the robbers wearing during the crime matched the description of some of the clothing Defendants were wearing when they were stopped.  In addition, other clothing the robbers wore and keys to the bank were found beside the vehicle registered to Jonathan Scott, which contained a green bag and a gun resembling the one depicted on the video.  Third, the two men the manager identified were stopped 100 to 125 yards from the bank, and she identified them less than twenty minutes after the robbery.  Finally, she "seemed pretty sure" Jonathan Scott was one of the robbers, J.A. 317, and indicated "that she was sure," J.A. 319, that Joel Scott was the other.  While the manager's identification was limited, any shortcomings, such as the fact that her attention to one robber was interrupted when the other entered her office and that she could not see their faces, "go more to the weight of the evidence than the reliability of [her] identification[], and thus were issues for the jury."  Brownlee, 454 F.3d at 140.  Accordingly, we cannot say that the District Court abused its discretion in admitting the manager's identification.

III

For these reasons, we will affirm.