PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2970
_____

UNITED STATES OF AMERICA,

v.

JUSTINE WRIGHT,
                                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 09-cr-635-02)
District Judge:  Hon. Timothy J. Savage
_____

Argued
April 14, 2011

Before:   FISHER, JORDAN and COWEN, *Circuit Judges*.

(Filed:  June 1, 2011)
_____

Robert Epstein
Brett G. Sweitzer   [ARGUED]
Mark T. Wilson
Defender Association of Philadelphia
Federal Court Division
501 Walnut Street - #540 West
Philadelphia, PA   19106
        *Counsel for Appellant*

Maria M. Carrillo
Robert A. Zauzmer   [ARGUED]
Office of United States Attorney
615 Chestnut Street - #1250
Philadelphia, PA   19106
        *Counsel  for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

## I.      Background

Justine Wright[1] appeals the judgment entered by the United States District Court for the Eastern District of Pennsylvania sentencing him to 20 months' imprisonment. Wright argues that the sentence was procedurally unreasonable due to the erroneous application of an 8-level

_____

[1] In the record and briefs, Wright is referred to as both "Justin Wright" and "Justine Wright."  We use "Justine" here, as that name was used by Wright in his notice of appeal.

enhancement. Although the District Court's rationale for applying the 8-level enhancement was thoughtful and well-explained, we agree with Wright that the enhancement should not have been applied in this case and will therefore vacate and remand for resentencing.

### A.     Factual History

On July 2, 2009, Wright approached Andrew Cella at Cella's pizza restaurant in Morgantown, Pennsylvania, to inquire about purchasing the restaurant. Cella told Wright that he would sell the restaurant for $400,000. Wright said he did not have the money right then but that he would return later with his brother, who did have the money. On July 6, 2009, Wright returned to the restaurant accompanied by Soko Kanneh, who Wright falsely identified as his brother. Wright and Kanneh renewed Wright's earlier offer, and Cella again told them he would sell the restaurant for $400,000. Wright and Kanneh told Cella that they had the money, informing him that their father had made "good money" as a political figure and head of Sierra Leone's National Bank. Their father, they said, had recently been assassinated, and they had fled to the United States as refugees. Cella was interested in their offer, and they agreed to meet again for dinner to discuss the details.

Several days later, Cella met Wright and Kanneh for dinner at their hotel in Philadelphia. After dinner, Kanneh told Cella that he wanted to show him something, and the three men went to Cella's car. Once in the car, Kanneh removed a stack of black paper from a bag along with a plastic plate and several small bottles of liquid. Kanneh told Cella that the black paper was U.S. currency that had been

given to Sierra Leone by the United States as aid but had been dyed black to keep it from being used by any rebels who might intercept it. He explained that the black dye could only be removed by a special solvent. Kanneh and Wright told Cella that their father had been responsible for cleaning the money for the Sierra Leone government and that, after he died, they had brought the money with them to the United States.

As Kanneh and Wright told Cella about the black money, Kanneh demonstrated the cleaning process by placing two black pieces of paper in the plastic plate, coating them with liquid from one of the bottles, and then "slosh[ing] [them] around on the plate like he was panning for gold." (App. at 93.) As Kanneh did this, the paper "started to clean up" and "bec[ame] clearer and clearer." (*Id.*) Once the pieces of paper were clean, they were revealed as two genuine $100 bills. Kanneh told Cella that he and Wright had millions of dollars in black bills in their hotel room but that they needed large amounts of money in order to buy the solvent to clean the bills. Kanneh and Wright then offered to sell Cella $120,000 worth of black bills and the necessary solvent to clean them for $60,000.

Although Cella told Wright and Kanneh that he would try to raise the $60,000, he instead contacted the police, who put Cella in touch with the U.S. Secret Service. At the behest of Secret Service Agent Matt Cimino, Cella contacted Wright and Kanneh to arrange another meeting, telling them he had a friend who also wanted to invest in the black money. Wright and Kanneh agreed to another meeting but stated that if there was a second investor, they wanted $100,000, for which they would deliver $200,000 worth of black money. Cella

4

arranged for Agent Cimino and himself to meet Wright and Kanneh on August 26, 2009, in a Philadelphia hotel room. There, Wright and Kanneh repeated their earlier demonstration for Agent Cimino, cleaning two genuine $100 bills that had been dyed black. They then showed Agent Cimino a suitcase full of black paper, which they claimed was $200,000 worth of "black money" but which was actually plain black construction paper. They told Agent Cimino that they had sufficient cleaning solution with them to clean all $200,000 and that they would sell Agent Cimino the money and the cleaning solution for $100,000. Following that performance and offer, Wright and Kanneh were arrested.

### B.    Procedural History

On September 24, 2009, Wright and Kanneh were charged with two counts of possessing and passing altered currency, in violation of 18 U.S.C. § 472; two counts of possessing false or fictitious items, in violation of 18 U.S.C. § 514(a)(2); and one count of conspiring to do the same, in violation of 18 U.S.C. § 371. After Kanneh pled guilty, Wright proceeded to trial. At the conclusion of the evidence, the District Court entered an order of acquittal for the two § 514(a)(2) charges, after which the jury convicted Wright on the remaining charges of possession of altered currency and conspiracy.

In preparation for a sentencing hearing on June 29, 2010, a presentence investigation report recommended an offense level of 17, calculated by taking a base offense level of 9, pursuant to United States Sentencing Guidelines

5

("U.S.S.G." or the "Guidelines") § 2B5.1(a),[2] and adding to it an 8-level enhancement pursuant to U.S.S.G. § 2B5.1(b)(1). Section 2B5.1(b)(1) states:

> If the face value of the counterfeit items (A) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (B) exceeded $5,000, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

The table in § 2B1.1, in turn, calls for an 8-level enhancement for amounts between $70,000 and $120,000.

Wright objected to the application of the 8-level enhancement, arguing that § 2B5.1(b)(1) called for any enhancement to be based on "the face value of the counterfeit items," which all parties acknowledged was $400, that is, the four $100 bills used in the demonstrations. The District Court overruled Wright's objection, concluding that, despite § 2B5.1(b)(1) referencing only the "face value of the counterfeit items," the enhancement could be applied based on the loss Wright intended to cause. The Court explained:

> I don't think that there is any question that the sentencing commission never anticipated the

---

[2] U.S.S.G. § 2X1.1, which covers conspiracy convictions under § 371, directs the sentencing court to use the base offense level from the Guideline provision applicable to the substantive crime, which, in this case, is § 2B5.1. As a result, Wright's conviction for conspiracy under § 371 did not alter the base offense level.

6

situation that we have before us. This is something new. Okay. And I am confident that had it been presented with such a case as this, that it would focus on what the intended loss was as opposed to the actual altered currency. … What they were using here is a scam and I believe that if the commission were to consider it, that they would calculate the offense level based upon the total loss. And therefore, I am going to deny your request to change that.

(App. at 312-13.)

Based on that calculated offense level of 17 and a criminal history category of III, the recommended Guidelines sentence was 30 to 37 months' imprisonment. After analyzing the 18 U.S.C. § 3553(a) factors, the Court varied downward, and imposed a sentence of 20 months' imprisonment and three-years' supervised release.[3] In doing so, the Court stated that the sentence it imposed was the same as it would have imposed even if the 8-level enhancement pursuant to § 2B5.1(b)(1) did not apply.

Wright's timely appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 18

---

[3] Neither party has objected to the variance under § 3553(a), and, therefore, it is not discussed herein.

7

U.S.C. § 3231, and we have jurisdiction pursuant to 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291.

In sentencing a defendant, district courts follow a three-step process:  At step one, the court calculates the applicable Guidelines range, *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009), which includes the application of any sentencing enhancements, *United States v. Shedrick*, 493 F.3d 292, 298 n.5 (3d Cir. 2007).  At step two, the court considers any motions for departure and, if granted, states how the departure affects the Guidelines calculation. *Tomko*, 562 F.3d at 567.  At step three, the court considers the recommended Guidelines range together with the statutory factors listed in 18 U.S.C. § 3553(a) and determines the appropriate sentence, which may vary upward or downward from the range suggested by the Guidelines. *Tomko*, 562 F.3d at 567.

Our review of a criminal sentence is for abuse of discretion and proceeds in two stages. *Id.*  First, we review for procedural error at any sentencing step, including, for example, failing to make a "correct computation of the Guidelines range" at step one, *United States v. Langford*, 516 F.3d 205, 214 (3d Cir. 2008), failing to rely on "appropriate bases for departure" at step two, *United States v. Ali*, 508 F.3d 136, 148 (3d Cir. 2007) (internal quotation marks omitted), or failing to give "meaningful consideration to the § 3553(a) factors" at step three, *United States v. Merced*, 603 F.3d 203, 215 (3d Cir. 2010) (internal quotation marks omitted).[4]  If we

---

[4] The Supreme Court's decision in *Gall v. United States* lists a number of potential procedural errors, "such as

8

find procedural error at any step, we will generally "remand the case for re-sentencing, without going any further." *Id.* at 214.

If there is no procedural error, the second stage of our review is for substantive reasonableness, and "we will affirm [the sentence] unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Tomko*, 562 F.3d at 568.

## III.    Discussion

On appeal, Wright argues that the District Court committed procedural error at step one by imposing an 8-level enhancement for intended loss under U.S.S.G. § 2B5.1(b)(1).  He says that, because § 2B5.1(b)(1) sets forth an enhancement based only on "the face value of the counterfeit items," applying the enhancement based on intended loss was an abuse of discretion.  We agree that intended loss is not an aspect of § 2B5.1(b)(1), though we do not accept all of Wright's reasoning.

Both in his briefs and at oral argument, Wright argued that the District Court had the option of applying § 2B5.1 with its base offense level of 9 but no enhancement, or

---

failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range." 552 U.S. 38, 51 (2007).

applying § 2B1.1 "*in toto*" with a base offense level of 6 and an enhancement based on intended loss. However, the assertion that either § 2B5.1 or § 2B1.1 could be applied under these circumstances is incorrect. Wright was convicted of altering four $100 bills in violation of 18 U.S.C. § 472. While the statutory index to the Guidelines states that either § 2B5.1 or § 2B1.1 may be applied for convictions under § 472, the index further instructs that "[i]f more than one guideline section is referenced for the particular statute, use the guideline most appropriate for the offense conduct charged in the count of which defendant was convicted." *See* U.S.S.G. app. A. Here, § 2B5.1 states that it applies to offenses involving "Counterfeit Bearer Obligations of the United States," whereas § 2B1.1 applies to offenses involving "Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." The Guidelines define "bearer obligations of the United States" as obligations "not made out to a specific payee," including, among other things "currency and coins," and define counterfeiting to include altering. U.S.S.G. § 2B5.1 cmt. n.1, 2. Accordingly, because the "offense conduct" Wright was charged with was altering "bearer obligations of the United States," namely $400 in United States currency, § 2B5.1 is the appropriate base Guideline to apply in this case.

The District Court thus properly applied § 2B5.1 and its base offense level of 9. Then, relying on the instruction in § 2B5.1(b)(1) to increase the offense level according to the table in § 2B1.1"if the face value of the counterfeit items … exceeded $5,000," the Court concluded that, because the intended loss for Wright's scheme was $100,000, it should increase the offense level by 8, the number indicated

10

in the § 2B1.1 table for values greater than $70,000 and less than or equal to $120,000.

While we have never addressed whether § 2B5.1(b)(1) supports an enhancement for intended loss, the language of that section directs any enhancement to be based on face value only. The government concedes that point, acknowledging that § 2B5.1(b)(1) does not support a step-one enhancement based on intended loss. The government's only argument on appeal is that the District Court did not apply a step-one enhancement but, instead, made a step-two upward departure. The government points to U.S.S.G. § 5K2.0(a)(2)(B), which allows upward departures where "there is present a circumstance that the Commission has not identified." Although the Court never used the word "departure," the government argues that the Court's statement that "the sentencing commission never anticipated the situation that we have before us" invoked § 5K2.0(a)(2)(B) and should be viewed as a departure.

We do not dispute the District Court's conclusion that "the sentencing commission never anticipated the situation" presented by this case. (App. at 312.) Indeed, the primary harm in a scheme of the sort at issue here is the amount sought by the fraud, not the nominal value of the currency defaced to perpetrate the fraud. Thus, by focusing on the value of the defaced currency, § 2B5.1 does not address the gravamen of the harm, as the District Court quite rightly pointed out.[5] A step-two upward departure for unidentified

_____

[5] We note that, because of its focus on the face value of the counterfeit items, rather than intended loss, § 2B5.1 would not distinguish between a black money scheme that

11

circumstances under § 5K2.0(a)(2)(B) would therefore be justified, as would a step-three upward variance under § 3553(a)(2)(A) "to reflect the seriousness of the offense," and the District Court might have legitimately reached the imposed sentence or a similar one through either or both of those procedural mechanisms.

Nonetheless, despite the government's argument to the contrary, that is not what the Court did. The record plainly shows that the District Court imposed a step-one enhancement. The Court overruled Wright's objection to the application of the 8-level enhancement and stated that "the offense level will remain at 17." (App. at 313.) As Wright correctly notes, "[i]f the district court had imposed a step-two departure, the court would have *sustained* Mr. Wright's objection to the enhancement, identified the applicable Guidelines range as 8-14 months, and then proceeded to upwardly depart from that range. Instead, the court squarely *overruled* Mr. Wright's objection." (Reply Brief for Appellant at 3 (emphasis in original).) Furthermore, the government never made a motion for an upward departure, nor did the District Court so much as mention the word "departure." There is simply no basis in the record to conclude that the District Court did anything other than apply a step-one enhancement for intended loss based on § 2B5.1(b)(1). Because § 2B5.1(b)(1) requires any enhancement to be based on the face value of the counterfeit

---

attempted to defraud a victim of $1,000 and one that attempted to defraud a victim of $1,000,000. Plainly, the sentencing commission did not have this kind of scheme in mind when they penned § 2B5.1.

items, the District Court erred in imposing an enhancement based on intended loss.

We acknowledge that a "form over substance" criticism can be leveled at that conclusion, but we are bound to follow what we perceive to be the plain meaning of the Guidelines. Furthermore, in the sentencing context it is firmly established that form – *i.e.* procedure – and substance are both of high importance. We have a responsibility "to ensure that a substantively reasonable sentence has been imposed in a procedurally fair way." *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008); *see also Merced*, 603 F.3d at 214-15 ("[T]he broad substantive discretion afforded district courts … makes adherence to procedural sentencing requirements all the more important."). And, of course, our recognition that the District Court could reach this same result by use of a departure or variance does not mean that that result is compelled. On remand, Wright will have the opportunity to argue that neither a departure nor a variance is warranted, something he was unable to do in the first instance. We cannot say whether the District Court will be persuaded by those arguments and, thus, cannot say whether the resulting sentence on remand will be identical to that already imposed.[6]

---

[6] The District Court's statement that it would have imposed the same sentence whether or not it had applied the 8-level enhancement does not affect our disposition. We have previously held that a statement by a sentencing court that it would have imposed the same sentence even absent some procedural error does not render the error harmless unless that "alternative sentence" was, itself, the product of the three step sentencing process. *United States v. Smalley*,

13

Although the identified error requires that we vacate and remand, we emphasize again our agreement with the District Court's conclusion that § 2B5.1 does not address the circumstances of this case. As we have already noted, the focus of § 2B5.1 on face value fails to capture the seriousness of Mr. Wright's crime, and we endorse the District Court's efforts to ensure that the sentence imposed is adequate in light of all relevant circumstances. We remand solely because those circumstance needed to be addressed at steps two or three of the sentencing process, rather than through the imposition of a step-one enhancement that, by its terms, does not apply.

## IV. Conclusion

For the foregoing reasons, we will vacate Wright's sentence and remand for resentencing.[7]

---

517 F.3d 208, 214-16 (3d Cir. 2008). Here, the District Court said only that it would have imposed the same sentence even absent the 8-level enhancement, without explaining what the Guidelines range would have been without the enhancement, and without explaining why an upward departure or variance would be merited from that range. As the government concedes, that alternative sentence is procedurally insufficient and does not render the error here harmless.

[7] Wright completed serving the 20-month sentence on February 8, 2011. The case is not moot, however, because Wright is still serving his period of supervised release and if, on remand, the District Court imposes a sentence of imprisonment less than the 20 months served, Wright may receive credit against his supervised release period for the excess months of imprisonment. *See United States v.*

14

*Cottman*, 142 F.3d 160, 165 (3d Cir. 1998) (holding that a sentencing appeal was not mooted by the prisoner's release because if "the appropriate sentencing range [was] reduced … . [it] would likely merit a credit against [the prisoner's] period of supervised release for the excess period of imprisonment").