**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3570
_____

UNITED STATES OF AMERICA

v.

MICHAEL HESTER,

Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 2-15-cr-00296-001)
District Judge: Honorable Kevin McNulty
_____

Argued: September 28, 2017

Before:  SMITH, *Chief Judge*, McKEE, and RESTREPO, *Circuit Judges*.

(Filed: November 30, 2018)
_____

MARK E. COYNE, ESQ.
JOHN F. ROMANO, ESQ. [ARGUED]
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

*Counsel for Appellee United States of America*

LETICIA OLIVERA, ESQ. [ARGUED]
K. ANTHONY THOMAS, ESQ.
Office of Federal Public Defender

1002 Broad Street
Newark, NJ 07102

     *Counsel for Appellant Michael Hester*

_____

OPINION OF THE COURT

_____

RESTREPO, *Circuit Judge.*

Michael Hester was convicted of being a felon in possession of a firearm following the District Court's denial of his motion to suppress. At sentencing, the District Court applied a four-level enhancement to Hester's Guidelines range under the theory that Hester's possession itself constituted New Jersey evidence tampering. In light of the District Court's uncertainty regarding the proper application of the enhancement, the court varied downward to mitigate its effect, and sentenced Hester to 86 months' imprisonment. Hester appeals both the denial of the motion to suppress and the application of the enhancement at sentencing.

For the reasons that follow, we will affirm the denial of the motion to suppress. However, we hold that the application of the evidence tampering sentencing enhancement was erroneous. Accordingly, we will vacate the sentence and remand to permit resentencing.

**I**

On October 7, 2014 around 11:40 p.m., Hiddayah Muse parked a car in front of a corner store in Newark, New Jersey, in close proximity to a crosswalk. Muse left the car idling while she entered the store, with Appellant Michael Hester waiting in the passenger

2

seat. Meanwhile, four officers in two police cars—one marked, one not—were on patrol in the area and noticed that the idling vehicle was illegally parked fewer than twenty-five feet from the crosswalk.[1]

The officers remained to investigate in light of the parking violation and the vehicle's location in front of a store with a known history of narcotics sales. Several of the officers had specific knowledge of the store's history. One had made multiple drug arrests there; another testified that he was "very familiar" with the store because it had "been the subject of many investigations" connected to "distribution of many various narcotics." App. 242. The officers also knew that the store had a buzzer system, which would allow staff to deny them permission to enter without a warrant.

As soon as Muse exited the store and re-entered the vehicle, the marked police car pulled up along the driver's side of the car, and the unmarked car pulled up behind it. The officers exited their cruisers and approached both sides of the vehicle on foot. One of the officers from the marked police car approached Muse at the driver's side window; the other three approached and stood at the passenger's side of the vehicle—in this case, on Hester's side.

When an officer began his questioning of Muse, she admitted that she did not have a driver's license and that the car was not registered in her name. At that point, the officer directed Muse to turn off the engine and step out of the car. Hester—who had remained in the passenger seat as the officers pulled up, approached the car on foot, and began

---

[1] *See* N.J. Stat. Ann. § 39:4-138(e).

3

questioning Muse—interjected, "We're good, officer. I can drive." App. 11. Hester then began to rise and exit the vehicle but, as he did so, one of the officers heard what sounded to him like the familiar thud of a gun hitting the floorboards of a vehicle. Another officer, who had been observing Hester's hands and testified to seeing him drop the gun, verbally alerted the other officers to the presence of a weapon. At the verbal signal, Hester attempted to run, but one officer reached for and caught Hester's shirt and Hester was quickly apprehended. In the interim, one of the officers near the vehicle confirmed the presence of a gun at the foot of the passenger's seat and remained with the weapon per police protocol. Hester was then arrested and taken into custody. Because of the rapid turn of events, the officers did not search Muse and ultimately allowed her to drive away, notwithstanding her lack of a license to drive the vehicle.[2]

Because Hester had previously been convicted of a felony, he was indicted for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Hester moved to suppress the firearm, arguing that the police had seized him the moment that they parked, with lights flashing,[3] alongside and behind the car in which he sat, and that the stop had not been

---

[2] The officers testified that they gave Muse a parking ticket. No corroborating evidence exists in the city's record-keeping system, and the officers could not (or did not) produce any evidence indicating they had done so.

[3] The District Court found that the officers "had not turned on their overhead lights[.]" App. 10. But one officer testified that the unmarked vehicle did not have overhead lights, though it did have interior and rear lights. That officer also testified that they would "customarily" activate available lights so as to clarify that police were present. App. 253. Yet the Court made no findings as to whether the unmarked cruiser's internal or rear lights were activated. The District Court also failed to make reference to the incident report noting that the officers had in fact activated the emergency lights. Although these open questions remain, we do not resolve them or decide whether the District Court erred in failing to

supported by reasonable suspicion. The District Court denied the motion, concluding that the interaction with the police up until Hester's attempt to flee was a consensual encounter. In the alternative, the District Court determined that, even if it assumed Hester had been seized when the officers boxed in the vehicle, such seizure was a *Terry* stop supported by reasonable suspicion because the car was illegally parked in front of a known narcotics front late at night in a high crime area. The parties thereafter stipulated to the facts and proceeded by bench trial. Hester was convicted on the sole count of the indictment.

At Hester's sentencing, the parties disputed the applicable Guidelines range. The pre-sentence report calculated an offense level of 26, which included a four-level enhancement for possession of a firearm in connection with another felony. U.S.S.G. § 2K2.1(b)(6)(B). Without the enhancement, the applicable Guidelines range would have been 84 to 105 months; with the enhancement, the range increased to 120 to 150 months. The Government sought the enhancement on the grounds that Hester's cousin had previously used the same firearm in an unrelated crime and had given it to Hester for disposal. In support of this theory, the Government cited recordings of calls Hester made to relatives from jail in which he expressed regret that he had still been in possession of the firearm when he encountered the officers, having intended to dispose of it. The Government argued that this was tantamount to evidence tampering, a separate felony under New Jersey law. *See* N.J. Stat. Ann. § 2C:28-6.

---

resolve them, as we ultimately conclude that answering these factual questions would not alter our outcome.

5

Although the District Court twice described the Government's proposed application of the sentencing enhancement as "a little crazy," the Court nevertheless applied the enhancement. App. 357. To mitigate its effect, however, the Court varied downward by four offense levels—the exact number added by the enhancement. The District Court sentenced Hester to 86 months' imprisonment, the Guidelines range that would have applied without the enhancement was 84 to 105 months.

Hester timely appealed both the denial of the motion to suppress and his sentence.

## II

The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Our review of the denial of a motion to suppress is for clear error as to the District Court's findings of fact, and plenary as to legal conclusions in light of those facts. *United States v. Davis*, 726 F.3d 434, 439 (3d Cir. 2013).

## III

"Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). One such exception to the warrant requirement permits brief, investigatory seizures commonly called "*Terry* stops." *Terry v. Ohio,* 392 U.S. 1 (1968). A police officer may conduct such a stop "when [the] officer has a reasonable, articulable suspicion that criminal activity is afoot[.]" *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000). However, this reasonable suspicion requirement is only triggered by a seizure, which occurs when an officer applies physical force or when a

6

person submits to an officer's "show of authority[.]" *California v. Hodari D.*, 499 U.S. 621, 625 (1991); *see also Terry*, 392 U.S. at 19, n.16.

Consensual encounters, by contrast, "implicat[e] no Fourth Amendment interest." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984)). They therefore need not be supported by reasonable suspicion or probable cause. Such voluntary interactions occur when an officer "approach[es] an individual on the street or in another public place[,]" *id.*, and a reasonable person in that position "would feel free to decline the officers' request or otherwise terminate the encounter[,]" *id.* at 430.

Relevant here, any evidence obtained incident to an unconstitutional seizure unsupported by reasonable suspicion "must be suppressed as 'fruit of the poisonous tree.'" *Brown*, 448 F.3d at 244 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). Thus, the crux of the Fourth Amendment issue before us is whether the weapon in the vehicle was recovered either during the course of a consensual encounter or a permissible seizure, or if, instead, it was recovered during an unconstitutional seizure and must be suppressed.

**A.**

"[I]t is settled law that a traffic stop is a seizure of everyone in the stopped vehicle." *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006); *see also Delaware v. Prouse*, 440 U.S. 648, 653 (1979). We have so held, because a traffic stop necessarily entails the communication by police of a "show of authority" and, by virtue of a vehicle's slowing down, ceasing to move, or refraining from reentering the roadway, submission to that authority. The circumstances under which a parked vehicle may be seized, however, is a

7

question we have answered to different effect.[4] Two cases in particular are instructive here.

In *United States v. Edwards*, two police cars pulled up to a parked, occupied convertible matching a description suspected to be involved in a crime. 53 F.3d 616, 617 (3d Cir. 1995). One police car pulled in front of the convertible, and the second pulled behind to box it in and inhibit an escape attempt. *Id.* One officer exited his car and approached the passenger's side on foot, and a second crouched behind his cruiser. *Id*. Soon thereafter, a third patrol car arrived, and a third officer approached with a police dog. Under that set of circumstances, we considered not whether the situation involved a consensual encounter or a seizure, but rather, a seizure or an arrest. We then recognized that the police conduct in *Edwards* was unquestionably a show of authority, at a minimum. *Id.* at 619. We ultimately held that the interaction was a permissible seizure that did not rise to the level of an arrest. *Id*. at 620.

---

[4] The District Court expressed incredulity at the idea that a police officer can conduct a "traffic stop" of a parked car. However, the court seems to conflate a "stop" for Fourth Amendment purposes with a stop in common parlance. But this concern is of no moment, as even the common, non-legal definition of the verb "to stop" describes the transitive verb as, *inter alia*, "to hinder or prevent the passage of[,]" "to get in the way of[,]" "to close up or block off[,]" and the intransitive verb as, *inter alia*, "to cease to move on[.]" *See Stop*, Merriam Webster, https://www.merriam-webster.com/dictionary/stop.

Here, the officers requested that the engine be turned off, thereby preventing it from re-entering the roadway. Simply because officers did not pursue the vehicle or pull the vehicle over does not render that vehicle incapable of being "stopped," in common parlance, or from seizure for Fourth Amendment purposes. Nonetheless, we need not address whether the interaction at issue in this case constitutes a "traffic stop." Rather, we focus on whether the vehicle was seized.

By contrast, in *United States v. Williams*, we held that police officers who inadvertently came upon an open, parked van in broad daylight engaged in a consensual encounter—not a seizure. 413 F.3d 347, 353-54 (3d Cir. 2005). There, the officers had stopped their vehicle twelve to thirteen feet away before approaching on foot. *Id.* at 349. Because "the van was parked in a public place with the rear doors open" in the mid-afternoon, the officers could see the van's occupant bagging a substance that appeared to be marijuana even from a distance. *Id.* at 354. When Williams noticed the officers approaching, he attempted to dispose of the bags, which the officers also saw. The Court ruled that this arms-length interaction was consistent with a consensual encounter by virtue of the obvious activity taking place in "in plain and open view." *Id.* at 352. We held that the information gleaned in that instance was sufficient to support a finding of probable cause to search the van and arrest Williams. *Id.* at 353. But prior to such arrest, no seizure had occurred and, therefore, no Fourth Amendment interest was implicated. *Id.* at 354; *Bostick*, 501 U.S. at 429.

Here, when Muse returned to the car, the officers drove up to it and parked around the vehicle, with the marked police cruiser at the driver's side and the unmarked car behind. Only once the patrol cars were stationed at the perimeter of the vehicle did the officers approach on foot. The officers, too, positioned themselves around the vehicle, near any potential exit points—one officer at the driver's side, and three officers on the passenger's side. Against this backdrop, the officer nearest Muse initiated the familiar line of questioning typical of a traffic stop: he asked her for her driver's license.

We conclude that the initial police conduct in this case is closer in kind, if not in degree, to the conduct in *Edwards* than to that in *Williams*. Here, Muse reentered the idling parked car, which would have been capable of leaving the scene, but for the change in circumstances signaled by the surrounding police cruisers and officers. Following this and the subsequent directive to turn off the engine, Muse assuredly would not have felt free to drive away, and a reasonable person in Hester's position would likewise not have felt free "to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437. It is this restraint on liberty that "marks the line between a fourth amendment seizure of any degree and a consensual encounter which does not require any minimal objective justification." *Edwards*, 53 F.3d at 620. We conclude that the officers' conduct falls on the seizure side of the line and is consistent with a show of authority.

**B.**

Our seizure analysis does not end with our conclusion that there was a show of authority, however. For us to conclude that a seizure occurred, we must find that Hester submitted to that show of authority. The Government argues—and the District Court found, in the alternative—that Hester failed to submit to any show of authority and the interaction was, therefore, not a seizure. *See Hodari D.*, 499 U.S. at 626. We are unpersuaded. We hold that Hester had submitted to the officers' show of authority when he waited in the vehicle with Muse prior to and during questioning, before Hester's momentary attempt to flee once the officers became aware of the gun.

In evaluating whether an individual has submitted to authority, brief, subsequent flight does not necessarily indicate an individual has failed to submit. We have held that

10

"not fleeing" in response to a show of authority suggests an individual has submitted to authority. *United States v. Lowe*, 791 F.3d 424, 434 (3d Cir. 2015). Indeed, we have held that simply remaining in place can constitute submission, regardless of subsequent flight. *United States v. Coggins*, 986 F.2d 651, 654 (3d Cir. 1993) (holding suspect had been seized after officers ordered him to remain, and he sat in a stairwell before fleeing "soon after"). Our sister circuits have reached the same conclusion under similar circumstances. *See United States v. Shields*, 789 F.3d 733, 744-46 (7th Cir 2015); *United States v. Morgan*, 936 F.2d 1561, 1567 (10th Cir. 1991).

By contrast, in our cases holding that the suspect had not manifested sufficient submission to authority, compliance was extraordinarily brief. In one case, the "momentary compliance" of a person who officers ordered to put his hands on a car was as brief as the suspect taking two steps towards the car in a feint, and subsequently dashing off. *United States v. Smith*, 575 F.3d 308, 315-16 (3d Cir. 2009). Similarly, we held that an individual had not submitted to authority when compliance was as brief as the individual responding "Who me?" to an officer's request that he stop, before immediately running. *United States v. Valentine*, 232 F.3d 250, 259 (3d Cir. 2000).

Here, in considering the totality of the circumstances, we are persuaded that Hester submitted to authority while he remained in the vehicle prior to his failed attempt to flee. Hester's short-lived flight followed a longer period of acquiescence. As previously addressed, Hester waited in the passenger seat when two police cars boxed in Muse's car along the curb and four officers approached the car on foot, and he continued to wait as one of the officers questioned Muse, and ordered her out of the car. Unlike in *Smith*, by the

11

time Hester said he could drive, stood up, and tried to run, Hester had long since submitted to authority.

C

Having concluded that Hester was seized, our inquiry now turns to whether the *Terry* stop was supported by "reasonable, articulable suspicion that criminal activity [wa]s afoot[.]" *Wardlow*, 528 U.S. at 123. Because we conclude that it was, we will affirm the denial of the motion to suppress.

We determine whether reasonable suspicion existed to support a stop under an objective standard and a totality of the circumstances approach. *See Terry*, 392 U.S. at 21-22; *Brown*, 448 F.3d at 246-47. That is, we consider whether "a reasonable, trained officer standing in [the detaining officer's] shoes could articulate specific reasons justifying" the stop. *Johnson v. Campbell,* 332 F.3d 199, 206 (3d Cir. 2003); *see also United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The "subjective intentions" of the officers do not factor into our analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006).

Among the factors we consider, "[t]he Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors [including, *inter alia*] specialized knowledge and investigative inferences . . . [as well as] personal observation of suspicious behavior." *Brown*, 448 F.3d at 247 (3d Cir. 2006) (quoting *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002)). Sub-factors that indicate suspicious behavior include the suspect's "[p]resence . . . in a high crime area[,]" "presence on a street at a late hour," and behavior "that conforms to police officers'

12

specialized knowledge of criminal activity." *Id.* at 251 (internal quotation marks and citations omitted).[5] Although we evaluate each factor "in turn," the relevant analysis is whether an officer would have reasonable suspicion given the "the whole picture." *Id.* at 247. Thus, even if any factor alone would be insufficient to support reasonable suspicion, the relevant factors, taken together, could nonetheless suffice.

Under an objective analysis in this case, many factors which may be independently insufficient constitute reasonable suspicion in the aggregate. Here, the officers observed a vehicle illegally idling near a crosswalk, in front of a store with a known history of narcotics-related activity, close to midnight, in a high-crime area of Newark. The officers' attention was initially, permissibly attracted by the illegally parked car. *Delfin-Colina*, 464 F.3d at 398. The officers' suspicion could then reasonably sharpen because of the vehicle's location and time of night. The vehicle was also parked in front of the known site of several narcotics investigations and drug-related arrests in which several of the officers had taken part. Because the officers had reasonable suspicion to detain the vehicle, including its passengers, *Mosley*, 454 F.3d at 253, the above considerations, taken together, amount to objectively reasonable suspicion to support Hester's seizure.[6] Accordingly, we agree with

---

[5] Cases to which *Brown* cites for support in cataloguing these relevant factors include *Wardlow*, 528 U.S. 119; *Adams v. Williams*, 407 U.S. 143 (1972); *United States v. Bonner*, 363 F.3d 213 (3d Cir. 2004); *Campbell*, 332 F.3d 199; *Nelson*, 284 F.3d 472; *United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000); *Valentine*, 232 F.3d 350; and *United States v. Brown*, 159 F.3d 147 (3d Cir. 1998).

[6] State high courts have occasionally distinguished between moving violations and parking violations. *See State v. Holmes*, 569 N.W.2d 181, 185 (Minn. 1997). In such an analysis, parking violations occasion less suspicion than moving violations. *Id.* Hester urges us to make the same distinction and decline to affirm the District Court's

13

the District Court that, because the seizure comported with the Fourth Amendment's requirements, Hester's motion to suppress was appropriately denied.

## IV

Having concluded that Hester's weapon was permissibly obtained, we now turn to whether the District Court erroneously applied a four-point enhancement to Hester's Guidelines calculation pursuant to U.S.S.G. § 2K2.1(b)(6)(B). We review a district court's interpretation of the United States Sentencing Guidelines *de novo*. *United States v. Keller*, 666 F.3d 103, 105 (3d Cir. 2011). We review a district court's "application of the Guidelines to a specific set of facts" for clear error. *United States v. Richards*, 674 F.3d 215, 219-220 (3d Cir. 2012).[7]

The Guidelines provision at issue here provides for a four-point increase of a defendant's Guidelines range calculation, where the defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense[.]" U.S.S.G. § 2K2.1(b)(6)(B). We have previously held that the "[p]roper application of the four-level enhancement under [U.S.S.G.] § 2K2.1(b)(6) requires finding, by a preponderance of the

---

determination that the officers had reasonable suspicion to support the seizure. However, the nature of the violation—whether traffic or parking—was merely one factor among many at issue, and we do not today address whether a mere parking violation would be sufficient to support reasonable suspicion.

[7] The Government argues that Hester's objections at sentencing did not properly preserve his claim of error as to the enhancement. We conclude that Hester has sufficiently objected to the application of the enhancement for us to regard the claim as preserved.

14

evidence . . . that the defendant committed another felony offense." *United States v. West*, 643 F.3d 102, 110 (3d Cir. 2011).

We conclude that the District Court's application of the sentencing enhancement for the purported commission of New Jersey evidence tampering was erroneous for two reasons. First, the District Court's application of the enhancement to the specific facts of this case was clearly erroneous, because the Government did not show by a preponderance of the evidence that Hester had committed New Jersey evidence tampering. Second, the District Court incorrectly interpreted the Guidelines provision, as a matter of law, by finding that the possession itself—which was coextensive with the alleged secondary felony—occurred "in connection with" the subsequent felony offense. We hold that the application of the enhancement in such a manner is erroneous under any circumstances.

**A**

Even if the only issue before this Court were whether Hester had tampered with evidence, the Government did not meet its burden to show that Hester committed such a crime. The secondary offense at issue during sentencing was tampering with evidence under New Jersey law. N.J. Stat. Ann. § 2C:28-6. The New Jersey Supreme Court has held that "the crime of tampering with evidence of a possessory crime *includes as a necessary element the permanent alteration, loss, or destruction of the evidence itself.*" *State v. Mendez*, 814 A.2d 1043, 1049 (N.J. 2002) (emphasis added). The Government could not establish that Hester had effectuated the loss or destruction of the weapon, precisely because the Government *did* recover it.

15

Therefore, in order for the enhancement to apply, the Government would have had to show that Hester effectuated the permanent alteration of the gun in a manner that deprived the police of its evidentiary value, or that he took affirmative steps to do so. *See id.* The Government argues that Hester attempted to tamper with evidence, by virtue of his apparent intention to dispose of the gun, expressed after-the-fact in telephone conversations while Hester was incarcerated. But we cannot agree that *ex post* expressions of regret about not having committed a potentially criminal act amounts to an attempt to commit that same criminal act. Accordingly, because the Government failed to meet its burden to show by a preponderance of the evidence that Hester committed or attempted to commit evidence tampering as defined by New Jersey law, the District Court committed clear error by applying the sentencing enhancement to the facts in this case.

**B**

However, even without regard to whether the Government met its burden to show that Hester tampered with evidence, the sentencing enhancement under (b)(6)(B) would not apply to Hester's circumstances as a matter of law. The Guidelines provide for a four-point offense level enhancement "[i]f the defendant . . . used or possessed any firearm or ammunition *in connection with* another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed *in connection with* another felony offense." U.S.S.G. § 2K2.1(b)(6)(B) (emphasis added). Supreme Court precedent, this Court's case law, and the Guidelines all make clear that, in this particular context, the phrase to use or possess "in connection with" means the facilitation of the secondary felony offense.

16

In *Smith v. United States*, the Supreme Court expressed concern that this enhancement, as enshrined in an earlier analogous provision, would be erroneously applied to defendants who committed subsequent felonies while merely also possessing a firearm. 508 U.S. 223, 237-38 (1993). There, the Court emphasized that "the gun at least must facilitate, or have the potential of facilitating" the subsequent offense for the enhancement to apply. *Id.* at 238.

Following this decision, the commentary to the Sentencing Guidelines was amended in 2006 to include, *inter alia*, Application Note 14, which clarified that the (b)(6)(B) enhancement applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." U.S.S.G. § 2K2.1(b)(6)(B), cmt. n.14. Application Note 14 specifically cites burglary or drug trafficking offenses as those scenarios in which the enhancement might apply. *Id*.

We subsequently agreed with this understanding of the enhancement, holding that it applies when the defendant has "committed another felony offense . . . that the firearm facilitated." *West*, 643 F.3d at 110. We clarified that, in the drug context, the enhancement typically applies in situations of trafficking, whereas mere possession of drugs by a person who also possessed a gun was insufficient. *West*, 643 F.3d at 113.[8] We further admonished more generally that our past precedent "should not be read to imply that simply possessing

---

[8] In so doing we joined the Fourth, Fifth, and Eighth Circuits, which make the same distinction. *United States v. Jenkins*, 566 F.3d 160, 163 (4th Cir. 2009); *United States v. Jeffries*, 587 F.3d 690, 692-93 (5th Cir. 2009); *United States v. Mansfield*, 560 F.3d 885, 887-88 (8th Cir. 2009).

17

a firearm during the commission of another felony offense is sufficient to invoke the enhancement of § 2K2.1(b)(6)." *West*, 643 F.3d at 115-16.

In *Keller v. United States*, mere months after we decided *West*, we permitted the enhancement's application where the firearm at issue had been used in the commission of a burglary. 666 F.3d at 107. There, we reasoned that burglary and felon in possession differed on an element-by-element basis. "[M]ore than mere possession of the firearm—brandishment or other use—was an integral aspect of the predicate offense." *Id.* at 106 (quoting *United States v. Navarro*, 476 F.3d 188, 196 (3d Cir. 2007)). In reaching our conclusion we also relied on the 2006 amendment, finding that the Guidelines confirmed both that "facilitation" was a critical component of any predicate offense, and that "burglary" was the type of crime contemplated by the enhancement. *Id.* at 107.

Hester's possession of the firearm did not facilitate or enhance his ability to tamper with evidence in the manner contemplated by the Guidelines. He did not brandish or otherwise use the firearm to tamper with evidence; he merely possessed it.[9] Indeed, Hester's purported evidence tampering was coextensive with the possession of the weapon itself. The Government argues that "Hester's possession of the firearm was not an integral aspect of the evidence tampering offense." Appellee Br. at 35. But had Hester not possessed

---

[9] Though we do not address whether or to what extent violence might be contemplated by the enhancement, the District Court recognized that "there [we]re no indications that [Hester] had [the weapon] with him because he intended to use it in some violent manner, just to be clear on that." App. 375. We so state merely to clarify that the Government did not allege and the District Court did not find that burglary, drug trafficking, or conduct of the type contemplated in Guidelines commentary Note 14 was implicated here.

18

the gun, there would be no discussion regarding whether he tampered with it and there would also be no underlying charge.

Consistent with our clear precedent and the Guidelines commentary, we hold that applying the § 2K2.1(b)(6)(B) enhancement to a sentence for an underlying offense of possession of a weapon is improper when the alleged evidence tampering involves merely possessing that same weapon. Rather, in order for the enhancement to apply, the weapon must facilitate a subsequent felony offense of the kind contemplated by the Guidelines and our precedent. *West*, 643 F.3d at 110.

## V

We review criminal sentences for abuse of discretion in two steps. *See United States v. Wright*, 642 F.3d 148, 152 (3d Cir. 2011). First, we assess whether there has been a procedural error in the sentencing process. Second, if we find no procedural error, then we review for substantive reasonableness. *Id.* "If we find procedural error at any step, we will generally 'remand the case for re-sentencing, without going any further.'" *Id.* (quoting *United States v. Merced*, 603 F.3d 203, 215 (3d Cir. 2010)).

The improper calculation of the Guidelines range is a procedural error. *Id.* "When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, 136 S.Ct. 1338, 1345 (2016); *see also Wright*, 642 F.3d at 152 (recognizing we ordinarily remand for resentencing without conducting any additional inquiry upon a finding of procedural error). Thus, the application of the four-

19

point enhancement to Hester's Guidelines range was procedural error, and we will remand for resentencing.

In doing so, we recognize that we have, in exceedingly rare instances, declined to remand for resentencing where there are indicia suggesting "that an erroneous Guidelines calculation did not affect the sentencing process and the sentence ultimately imposed." *Langford*, 516 F.3d at 219. We further recognize that, here, the District Court provided an explicit statement that it intended to rectify a likely Guidelines miscalculation when imposing the sentence—it set the parameters of the downward variance in reference to "[i]f that four-point guideline adjustment had not applied, [when] the range would not be 120 to 150, but would be 84 to 105" months. App. 378.

Despite these assurances, however, we ordinarily remand for sentencing upon a finding of a procedural error. Indeed, we have done so under similar circumstances, where a district court departs downward from an erroneously-calculated sentencing range to impose a sentence that seems reasonable, because "we cannot be sure that the district court would have imposed the same sentence if not for the errors." *United States v. Vazquez-Lebron*, 582 F.3d 443, 446 (3d Cir. 2009); *see also United States v. Langford*, 516 F.3d 205, 219 (3d Cir. 2008) (remanding for resentencing in a case involving an erroneous Guidelines calculation, even when the ultimate sentence imposed stood at the "lowest point in the advisory Guidelines range[]"). Though we recognize the District Court's careful consideration of the effect of the enhancement, we will not rely on conjecture to conclude that the District Court necessarily would have imposed the same sentence absent the error.

Moreover, we will remand to correct the procedural error to ensure the "fairness[] [and] integrity . . . of judicial proceedings" and prevent the erosion of public confidence in our judicial system writ large. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (June 18, 2018) (quoting *United States v. Olano*, 507 U.S. 725, 735-36) (1993)); *see id.* at 9-10 ("Ensuring the accuracy of Guidelines determinations also serves the purpose of 'providing certainty and fairness in sentencing' on a greater scale.'"). Although the Government maintains that remanding for resentencing would be a "pointless formality" on the facts of this case, Appellee Resp. to Rule 28(j) Letter, at 2, advancing these interests and ensuring Hester's sentence is procedurally sound are neither pointless endeavors, nor mere formality.

Because we conclude that the procedural error here is, in and of itself, "sufficient to show a reasonable probability of a different outcome absent the error[,]" *Molina-Martinez*, 136 S.Ct. at 1345, we will vacate Hester's sentence and remand.

## VI

For the reasons set forth above, we will affirm the District Court's denial of Hester's motion to suppress, vacate the District Court's Judgment, and remand for resentencing.